**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TAMMI KILLIS,** | ) | |
| **Plaintiff,** | ) | **Case No. 13 C 6532** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **CABELA'S RETAIL II, INC.,** | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Australian recording artist Olivia Newton-John recorded the song "Physical" in 1981.[1]  In 1992, Newton-John released *Olivia Physical*, a compilation of music videos that included a video for the song "Physical" featuring Newton-John, clad in a leotard and wearing a sweatband over her brow, in the role of a gym instructor.  In 2012, the song "Physical" surfaced at defendant Cabela's store in Hoffman Estates, Illinois, during the December holiday season as part of a series of eight Jib Jab videos playing on a loop in the employee break room.[2]  Jib Jab videos depict the heads and/or faces of individuals placed onto other individual's bodies.  The Jib Jab "Physical" video included the faces of plaintiff Tammi Killis and another Cabela's employee on bodies wearing form-fitting '80s-style workout wear that were moving in front of a green background in what Killis believed was a sexually suggestive manner during an approximately 90-second excerpt from the song "Physical."  Killis sued Cabela's, contending that the video and a series of comments that co-workers made about the video created a hostile

---

[1] The parties refer to the song as "Let's Get Physical" and "Physical."  The correct title appears to be "Physical."  *See* http://www.grammy.com/blogs/the-grammys-trailblazing-women-part-one.

[2] Cabela's refers to employees as "outfitters."  The court will use both terms in this opinion.

work environment that violated Title VII, 42 U.S.C. § 2000e, *et seq.*[3]  Cabela's motion for

summary judgment is before the court.  For the following reasons, Cabela's motion is granted.

## I. BACKGROUND

### A.    Local Rule 56.1

Cabela's filed a reply in support of its Local Rule 56.1 statement.  (Dkt. 40.)  This is a

procedurally improper attempt to have the last word in a manner that is not contemplated by the

local rules.  *See Lincoln Nat. Life Ins. Co. v. TCF Nat. Bank*, 875 F. Supp. 2d 817, 821 (N.D. Ill.

2012) (characterizing the submission of a reply in support of a Local Rule 56.1 statement as

"highly unusual" and striking the reply as unauthorized by the Local Rules and improper); *Curtis*

*v. Wilks*, 704 F. Supp. 2d 771, 778 n.1 (N.D. Ill. 2010) ( sua sponte striking "the defendants'

reply to plaintiffs' response to defendants' statement of facts because Local Rule 56.1 does not

contemplate such a filing"); *Benitez v. American Standard Circuits, Inc.*, 678 F. Supp. 2d 745,

755 (N.D. Ill. 2010) (same).  Thus, the court will not consider Cabela's reply in support of its

statement of facts.

In addition, Killis disputes some of the facts in Cabela's statement by referring to her

responses to other facts.  *See, e.g*, Dkt. 36, Pl.'s Resp., ¶¶ 16-17.  The cross-referenced

responses do not fairly respond to the paragraphs at issue.  To the extent that Killis did not

properly respond by pointing to "specific references to the affidavits, parts of the record, and

other supporting materials relied upon," the corresponding fact is deemed admitted.  L.R.

---

[3] Prior iterations of Killis' complaint included a retaliation claim.  The second amended
complaint contains a single claim for hostile work environment discrimination.  Because Killis is
no longer pursuing a retaliation claim, the court will not address any of Cabela's passing
references to retaliation in its motion for summary judgment

56.1(b)(3)(B); *see also Flores v. Giuliano*, No. 12 C 162, 2014 WL 3360504, at *2 (N.D. Ill. July 9, 2014); *Bennett v. Unitek Global Serv., LLC*, No. 10 C 4968, 2013 WL 4804841, at *3 (N.D. Ill. Sept. 9, 2013).

Finally, the court also notes that Killis did not reproduce Cabela's' statement of facts in its entirety. Instead, she inserted "citations omitted" or "quotations omitted" throughout her submission. This forced the court to flip back and forth between her response and Cabela's' statement of facts to locate the missing information. In any future summary judgment filings before this court, counsel should refrain from excerpting in this fashion.

**B.    Facts**

The following facts are drawn from the parties' Local Rule 56.1 statements and are undisputed unless otherwise noted.

**1.    Killis' Employment with Cabela's**

Cabela's is a retail operation that sells hunting, fishing, and related outdoor merchandise. The Cabela's Hoffman Estates store has approximately 220 employees and is headed by a Store Manager. It is organized into three major areas: (1) Operations (the front of the house, which consists of cashiers, customer service and the switchboard); (2) Hardlines (fishing, hunting, archery and firearms); and (3) Softlines (clothing, gifts department, home goods, footwear, and camping). Each area is run by a manager plus support personnel in Asset Protection and Human Resources. Moreover, key managers work in each area and report to that area's manager.

Killis began working at the Hoffman Estates Cabela's store in 2007 in the customer service department. In 2009, she was promoted to the managerial position of Customer Experience Manager and reported to the Operations Manager. In December 2012, Erik Hansen

was the Operations Manager. In her role of Customer Experience Manager, Killis was responsible for the front end of the store (cashiers, customer service, and the switchboard) and the supervision of more than thirty employees. Killis contends that in December 2012, she was working as the Acting Firearms Manager. Firearms was in the "Hardlines" area, which was managed at the time by Kevin Hart.

Killis received three performance evaluations after her promotion to Customer Experience Manager: (1) in February 2011, she received an "On Target" evaluation from the Operations Manager at the time, Tim Slaby; (2) in February 2012, she received another "On Target" evaluation from Slaby; and (3) in January 2013, she received an "Above Target" evaluation from Operations Manager Erik Hansen. Killis received a raise in each of the three years that she was a manager.

## 2. Cabela's Anti-Harassment Policy

When Killis began to work for Cabela's, she took a sixteen-hour training class about Cabela's Policies and Procedures, including a segment on sexual harassment and diversity. Killis was familiar with the anti-harassment policy at Cabela's, which provides, in relevant part, that:

**Policy - Anti Harassment**

. . . . Each individual has the right to work in an environment free from discriminatory harassment . . . .

Sexual harassment is a specific type of discriminatory harassment consisting of unwelcome or unwanted sexual attention, sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature . . . .

**Reporting Harassment**

Cabela's encourages employees who believe that they are being harassed to promptly notify the offender(s) that the behavior is unwelcome and must stop immediately.

If an employee chooses not to confront the offending individual(s) directly, or if the conduct continues after he/she has told the individual(s) to stop, the employee should immediately inform his or her supervisor or a Human Resources Manager. If the employee's supervisor is the source of the problem, the situation should be reported to a Human Resources Manager. Employees may also utilize Cabela's In-Touch Hotline (1-855-835-5222), email tellcabelas@getintouch.com or online https://tellcab.intercedeservices.com/ to report discriminatory harassment. If the alleged harassment occurs at a time other than an employee's normal business hours, their complaint should be filed as early as practicable on the first business day following the alleged incident.

Employees who witness or who have information regarding discriminatory harassment are also encouraged to report such information promptly to their supervisor, a Human Resources Manager or by calling the In-Touch Hotline.

**Investigating Complaints**

Cabela's will investigate all allegations of discriminatory harassment in as thorough, prompt, and confidential manner as is reasonably possible. Cabela's will undertake all inquiries with due regard to the privacy of all parties involved consistent with a thorough and appropriate investigation.

**Retaliation is Strictly Prohibited**

Cabela's will not retaliate against an individual who, in good faith, makes a report of discriminatory harassment or provides information concerning an act of discriminatory harassment, nor permit any other employees to do so. Retaliation is a serious violation of this policy and will not be tolerated. Persons who engage in retaliatory activity are in direct violation of this policy and will not be tolerated. Persons who engage in retaliatory activity are in direct violation of this policy and will be disciplined accordingly, up to and including immediate termination. Complaints and information of retaliation are subject to the same reporting, investigation, and remedial procedures as harassment complaints.

**Resolving the Complaint**

If Cabela's determines that an employee has violated this policy against discriminatory harassment and retaliation, disciplinary action will be taken

commensurate with Cabela's judgment as to the seriousness of the particular offense . . . .

(Dkt. 23, Def.'s Facts, ¶ 13.)

In July 2012, Killis invoked the Anti-Harassment Policy based on concerns that her manager (Operations Manager Tim Slaby) was involved in an inappropriate relationship with a cashier at Cabela's. Cabela's conducted an investigation and Slaby ultimately left Cabela's. Killis was aware that once concerns were raised regarding the Slaby situation, Cabela's conducted a prompt investigation.[4]

### 3.      The Jib Jab Videos

The Hoffman Estates Cabela's store held weekly "Fun Fridays" events to promote staff morale. These events were typically were held in the employee break room. When Killis was in charge of "Fun Fridays" in her role as a manager, she arranged activities such as getting "breakfast sandwiches for everyone from like Sonic or McDonald's and bring(ing) it in" and "play(ing) games like Chicago Cubs Trivia, stuff like that." (*Id*. at ¶ 18.) On two occasions – once in December 2012 and "once before" – Stacy Smith, another female manager who worked in Softlines, set up Jib Jab videos for "Fun Fridays." (*Id*. at ¶ 19.) Jib Jab videos are a form of

---

[4] This fact is deemed admitted based on an illustrative example of a non-responsive denial from Killis. Paragraph 17 in the statement of facts submitted by Cabela's states that, "Plaintiff knew that when she initiated the complaint of harassment (based on concerns she raised involving the . . . Slaby situation), it was promptly investigated by the Company." (Dkt. 23, Def.'s Facts, ¶ 17.) In response, Killis states "Disputed. See response to ¶ 14 above." (Dkt. 36, Pl.'s Resp. to Def.'s Facts, ¶ 17.) The only disputed fact in ¶ 14 refers to the use of the word "initiated" in a sentence stating that Killis "initiated" the investigation into Slady's relationship with a cashier working in his section of the store. While Killis may disagree with the use of the word "initiated' in paragraphs 14 and 17, this disagreement does not engage with the rest of paragraph 17. As such, the majority of that paragraph is deemed admitted. *See* Loc. Rule 56.1(b)(3)(C).

digital entertainment in which the image of a person's head and/or face is placed on someone else's body and used in cards or videos where they may be singing, dancing, and performing other activities.

In connection with what ended up as the December 2012 Jib Jab videos at the heart of this lawsuit, Smith approached the Store Manager, Art Hall, in mid-December 2012 to suggest adding a "Jib Jab" Fun Friday to the year-end holiday celebration for employees. Smith showed Hall a sample Jib Jab video featuring manager Erik Hansen. According to Smith, Hall approved "the concept" so she took responsibility for developing Jib Jab videos using pictures of Cabela's employees.[5]  (Dkt. 23, Def.'s Facts, ¶ 20.)

Jib Jab Fun Friday was scheduled for Friday, December 21, 2012. Human Resources administrative employee Cyndi Dentinger prepared a notice that was posted in the break room stating, "Fun Friday for 12/21 is 'Jib-Jab Friday' in the Upstairs Conference Room. Will YOU be in one of our skits? Come see and Find out?" (*Id*. at ¶ 21.) Smith completed the Jib Jab

_____

[5]  Killis objects to the evidence supported by Cabela's (Smith's declaration, Def. Ex. C) to support the proposition that Hall approved of the Jib Jab video concept and that Smith was responsible for preparing the videos. Killis contends that the court should not accept this portion of Smith's declaration because she did not have the opportunity to depose Smith. Killis does not make any representations about why she did not depose Smith. Moreover, upon receipt of the summary judgment motion, Killis did not seek relief under Fed. R. Civ. P. 56(d), which allows a party to request time to conduct further discovery necessary to respond to a motion for summary judgment. *See Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627-28 (7th Cir. 2014). Moreover, speculation about what might have happened when Hall and Smith discussed the idea showing Jib Jab videos as a part of the "Fun Fridays" holiday festivities will not suffice to defeat summary judgment. *See Widmar v. Sun Chemical Corp.*, No. 13-2313, — F.3d —, 2014 WL 6467287, at *4 (7th Cir. Nov. 19, 2014) (collecting cases). The court will, therefore, consider Smith's uncontroverted statements about her interaction with Hall and her role in the preparation of the Jib Jab videos.

videos late in the evening of December 20, 2012. The final product consisted of eight video clips that were accompanied by music, lasted less than ninety seconds each, and included a total of 26 male and female managers and employees. The clips were titled: (1) Holiday Disco; (2) Gangnam Style;[6] (3) Chippendales; (4) Office Party; (5) Hard Rockin' Holidays; (6) That's The Way I Like It; (7) Arabian Nights; and (8) Let's Get Physical. In her affidavit, Smith states that she selected images based on how the photo best fit on the face of the characters in the Jib Jab videos and that she included herself in one of the videos so that no one would feel that they were being targeted. Killis contends that the selection of Cabela's staff was not random because male heads appear on male bodies and female heads appear on female bodies.

During a morning meeting on December 21, 2012, Smith announced that she had developed the Jib Jab videos, and "we were NOT laughing at each other but WITH each other." (Dkt. 24 at Ex. C, Smith Decl., ¶ 10) (emphasis in original.) According to Smith, employees responded to the clips by laughing and some employees asked Smith how she made them, if they could watch the videos again, and if she could make a video with their faces. Unbeknownst to Smith at the time, other employees believed that some of the videos were inappropriate.

Killis did not work on December 21, 2012. She first saw the Jib Jab videos the next day, when she arrived for her Saturday shift. After several employees made comments about the videos and Smith called Killis on her work phone to ask her to go to the break room to watch the videos that she had made, Killis went to the break room, where the videos were playing on a loop.

---

[6] "Gangnam Style" is a song performed by the South Korean musician Psy. The song's music video has been viewed over 2.15 billion times on YouTube. See http://www.wired.com/2014/12/gangnam-style-youtube-math/.

Killis watched the videos – including the "Let's Get Physical" segment, which was at the end. She recognized employees featured in the videos, including Kevin Hart (Senior Hardlines Manager), Erik Hansen (Senior Operations Manager), herself (in a clip with other Cabela's staff, all in the guise of Santa's elves), Frank Mazzocco (Human Resources Manager), Cyndi Dentinger (Human Resources Administration), Ralph Petter (Gun Counter Outfitter), Matt Edelman (Customer Service Lead), Smith (Softlines Department Manager) and Nick Guzman (Maintenance Outfitter). Killis was aware that pictures of heads and/or faces were digitally added to bodies that did not belong to the depicted individuals.

The "Let's Get Physical" video had the faces of Joe Nebren (Hardlines Department Manager) and Killis on bodies that did not belong to either of them. The two individuals, male and female, were wearing shorts and a t-shirt and tights and a leotard, respectively. The video depicted them in a gym using workout equipment and doing various movements to an excerpt from the song "Physical" performed by Newton-John. Cabela's characterizes the characters as engaging in exercise, while Killis contends that the characters – including the one with her face – were placed in a sexually suggestive poses, such as having Joe Nebren's "character" stand behind Killis' "character" and, to use Killis' description, "thrust in a sexual manner."[7] (Dkt. 36,

_____

[7] In Killis' statement of additional facts, she includes a copy of the last page of Billboard magazine's February 2010 list of the "50 sexiest songs of all time." (Dkt. 36-1.) "Physical" – described as "the biggest hit of the '80s" – is in the number one spot, beating out songs such as "Dim All the Lights" by Donna Summer, "Slow Hand" by the Pointer Sisters, "Honky Tonk Women" by the Rolling Stones, and "Do That To Me One More Time" by Captain & Tennille. (*Id*.) The article states that the "sexiest lyrics" in "Physical" are "I took you to an intimate restaurant, then to a suggestive movie/ There's nothing left to talk about unless it's horizontally." (*Id*.) Cabela's argues that the article is irrelevant and inadmissible hearsay, except to the extent that it demonstrates that the video for "Physical" was well known and widely circulated. Specifically, Cabela's objects to the article because it does not specify an author or the methodology used to compile the list. The court agrees with Cabela's. It also notes that Killis'

Pl.'s Resp. to Def.'s Facts, ¶ 35.)  A sampling of screenshots from the video are attached to this opinion as an appendix.

Killis was angry and upset when she saw the "Let's Get Physical" video but did not approach Smith to express her feelings or ask that the videos be taken down.  At her deposition, Killis explained that she did not immediately complain about the video because she was taken aback by it and wanted to discuss the situation with her husband.  Killis's supervisor, Erik Hansen, was at work on Saturday, December 22, 2013, when Killis first saw the videos.  Killis did not speak with him or anyone else about the video on that date.  Instead, she left work early because she was upset by the video and comments that co-workers had made about the video (detailed below).

On Sunday, December 23, 2012, Killis was working at Cabela's.  She went into the break room and recorded all of the videos using her cellphone.  She also spoke with Chris Prejean (Asset Protection Manager) and Kevin Hart (Hardlines Manager and, according to Killis, her immediate supervisor because she was working as the Acting Firearms Manager at the time).

---

submission is the last page of the article.  *See* http://www.billboard.com/articles/list/959432/ the-50-sexiest-songs-of-all-time.  The first page contains the methodology:  an unspecified person determined what songs (out of an unknown set of music) had a "subject matter . . . directly related to sex, in some way."  (*Id.*)  The songs were then ranked "as based on each song's performance on the [Billboard] Hot 100 chart" using "an inverse point system, with weeks at No. 1 earning the greatest value and weeks at No. 100 earning the least.  To ensure equitable representation of the biggest hits from each era, certain time frames were weighted to account for the difference between turnover rates from those years."  (*Id.*)  The court assumes that Killis cited to the "50 sexiest songs of all time" list to support an inference that the song "Physical" is definitively tied to sexuality.  Even if the court considered the list, it would not support this inference as, at most, it merely demonstrates that "Physical" was an extremely popular song in the 1980s that refers obliquely to an intimate relationship in a way that is not necessarily more sexually evocative than any other song – either on or off the list of "sexiest songs" – with similar lyrics.

Killis generally got along well with both Prejean and Hart. At her deposition, Killis stated that she told Prejean that she had seen the video, that people were making comments and she wanted the video taken down. According to Killis, Prejean responded, "Fuck that, it's hilarious," and said that he would not take it down. (Dkt. 23, Def.'s Facts, ¶ 43.) Killis also asserts that she asked Hart to take the videos down but he declined to do so, commenting that others thought that they were funny and that Killis was "just being testy today." (*Id*. at ¶ 44.)

Killis left work early. She later told Mazzocco that she did so due to headache, nausea, and anxiety. As Cabela's notes, Killis did not support her description of her condition with any medical evidence. Killis did not work on Monday, December 24, 2012, but she learned that this was the last day that the videos were played. On December 28, 2012, Killis called in sick. According to Killis, she did so because the video and the reaction of the staff at Cabela's continued to make her very upset. Killis testified at her deposition that she went to her doctor, who referred her to a psychiatrist, and that she pursued therapy about the video. She also contends that she left work early on December 30th because of nausea, anxiety, stress, vomiting, and headache.

### 4.    Comments Made to Killis About the Jib Jab Video

Killis contends that eight employees made comments to her about the Jib Jab video.

- Tim Callahan (a cashier in the firearms area) said, "do you want to get physical." (*Id*. at ¶ 62.) Killis "kind of just turned and walked away thinking what a weirdo." (*Id*.)

- Kevin Luedtke (a camping outfitter) "approached [her] and asked [her] where [she] work[ed] out," said that she "looked good in the video," and then laughed and walked away. (*Id*.)

- Jonathan Barnett (a lead in the camouflage/clothing department) asked, "[W]hat gym do you work out at?" and then walked away laughing. (*Id*.)

- Rick Gorecki (a maintenance employee) "approached [her] and said he really liked [her] video, where [does she] work out?" (*Id.*)

- Greg Smith (unspecified position) walked by, made what Killis described as a "passing comment" asking if she wanted to get physical, and continued on his way. (*Id.* at ¶ 63.) Killis does not dispute that she understood he was joking and giving her a hard time about the video.

- When Brian Chapman (an employee in the fishing department) and a group of other employees were in the break room along with Killis, Chapman stated, "I really like your video" and laughed with the co-workers. (*Id.*) ("[Chapman] was sitting with some other people at a table. I was in there getting some coffee, and he just kind of shouted out that he really liked my video, and they were all over there chuckling, and I left.").

- Tom Johnson (an employee in maintenance) walked by Killis when she was on the sales floor and stated that he liked the video and that Killis appeared to have lost weight. According to Killis, Johnson was "kind of chuckling, giggling, as he walked by." (*Id.*)

- Samantha Sterinieri (an employee in the firearms department) told Killis that she thought the video was "really inappropriate" and asked Killis if she was "doing OK." (Dkt. 24, Killis Dep., at 173:14-174:6.)

### 5. Killis' Human Resources Complaint and the Resulting Investigation

On Saturday, December 22, 2012 (the day Killis first viewed the videos), Frank Mazzocco (the Human Resources Manager) was on vacation, but Killis was aware that she had the option of reaching Mazzocco's next in charge, Stacey McCroden, to communicate any concerns. Killis called McCroden the following day and left a message asking McCroden to return her call without any specifics about the nature of the call. Killis sent McCroden a follow-up email on Wednesday, December 26, 2012 (the next day that Killis worked) asking McCroden to call her as soon as possible without stating the reason for her call. Killis elected not to call the Cabela's hotline because she "figured that [McCroden] would call her back." (Dkt. 23, Def.'s Facts, ¶ 54.)

On Friday, December 28, 2012, McCroden contacted Killis on her cellphone and left a message. McCroden and Killis spoke on the telephone on December 29, 2012. During this conversation, Killis advised McCroden that she had contacted a lawyer and provided his contact information. Killis explained that she felt harassed based on a Jib Jab video playing in the break room depicting her in "80's spandex" dancing with manager Joe Nebren to "Physical" who was thrusting his hips behind her image. (Dkt. 24, Ex. E, Doc. 17, Page ID 284.) Killis also recounted the "fuck it" conversation with Prejean, Hart's rejection of her request to take down the video, and questions from staff asking if she wanted to "get physical" and her weight loss shown on the video.

Human Resources Manager Mazzocco called Killis to set up a meeting to discuss the investigation into her complaint. They set up a meeting on January 2, 2013, when they were both scheduled to be at work. Killis and Mazzocco met as planned for approximately 30-45 minutes. Mazzocco confirmed that he was conducting an investigation and asked Killis to read and sign a form outlining the procedures Mazzocco would use. Killis knew that was his standard protocol based on prior investigations in which she had been involved. Killis also gave Mazzocco notes she had prepared documenting her concerns. According to Killis, she had prepared these notes day-by-day based on her past experiences with investigations and Mazzocco because "[she] knew he was going to want to know who said what to [her] when." ((Dkt. 23, Def.'s Facts, at ¶ 58.)

Mazzocco took notes during the meeting. The notes reflect that Killis explained that she was "OK" with the elf video and described it as "cute" but stated that the "Physical" video made her feel "degraded and disrespected." (*Id*. at ¶ 60.) In addition, Killis related her interactions

with Prejean and Hart and told Mazzocco that a witness heard Prejean's comments.   She also told Mazzocco that her desired outcome was that she did not "want anyone else to ever be put in this position." (*Id.*)  When asked if, in her opinion, there had been a violation of company policy, she responded, "Yes, respect for individuals as well as honesty and integrity." (*Id.*)

From December 28, 2012 through January 11, 2013, Mazzocco conducted an investigation regarding the Jib Jab video and its aftermath.  He spoke with Killis twice and also spoke with General Manager Art Hall, Operations Manager Erik Hansen, Softlines Department Manager Stacy Smith, Hardlines Department Manager Joe Nebren, Hardlines Manager Kevin Hart, Asset Protection Manager Christopher Prejean, Customer Service Lead Outfitter Catherine Duresa, Marketing Manager Diane Schneider, Footwear Lead Outfitter David Petrow, Cash Office Outfitter Rita Cancio, Seasonal Cashier Claire Lego, and Camo Clothing Lead Outfitter Jonathan Barnett.

Mazzocco also reviewed the email Killis sent McCroden, the entire Jib Jab video, the Jib Jab employee announcement created by Human Resources employee Cyndi Dentinger, statements from Erik Hansen, Joe Nebren, Kevin Hart, Chris Prejean, David Petrow, Claire Lego, Jonathan Barnett, and Stacy Smith, a copy of Killis' notes, letters of support for Killis from Retail Greeter William Stout, Firearms Inspector Steven Ansley, and Customer Service Lead Outfitter, Catherine Duresa, managers' schedules for the last two weeks of 2012, Killis' employee badge use from December 22, 2012 – December 31, 2012, records of employee badges used to access the main office on December 23, 2012, records of the "heads" used for Jib Jab clips and the date they were added to Stacy Smith's Jib Jab account, and records relating to various photographs stored electronically by Cabela's.

Specifically, the email from Nebren (who appeared in the video with Killis) stated that he did not have prior knowledge that his picture would be used and that the video made him feel "uncomfortable" because "it was not in good taste" so he "should have been consulted before it was released." (Dkt. 24, Ex. E, Doc. 50, Page ID 459.) Ansley wrote a letter stating that he was "stunned" by the video and thought to himself "if [that] was [his] wife in [the video he] would be outraged." (*Id*. at Page ID 514). Ansley described himself as "old school" because he had been married for thirty-five years and "wonder[ed] if Jim + Dick Cabela would have approved?" (*Id*.) Stout wrote a letter expressing his opinion that the video depicted Killis in "sexually suggestive positions," portrayed "[Killis] as something she is not," and did "not honor [Killis] in the work place" or "take into account that she was a married woman with a husband and child." (*Id*. at Page ID 515). Duresa made a statement to Mazzocco stating that she thought the video was "disturbing and not business appropriate." (*Id*. at Page ID 490.) Duresa also wrote a letter stating that she left the meeting before the "Physical" Jib Jab video ended because she felt "uneasy" and "[she] could sense that [she] wasn't alone." (*Id*. at Page ID 513).

When Mazzocco finished his investigation on January 11, 2013, he called Killis (who was on vacation) to provide a status update. Because he was surprised that Killis did not take down the video herself since she was a manager and the DVD player was readily accessible, he asked Killis why she did not do so. Killis responded that she was not aware that she could do so. Mazzocco asked her, again, what she would like to see as an outcome, and she responded that she wanted to make sure that this type of situation did not reoccur.

As a result of the investigation, Mazzocco determined that manager Chris Prejean conducted himself inappropriately based on his interaction with Killis, including his use of

profanity, and terminated Prejean's employment. Killis believes that Prejean was terminated because of his use of profanity, not because he had declined to take down the video. Smith left Cabela's a few weeks after the Jib Jab video incident. Killis stated at her deposition that Smith told Killis that she left for "her own reasons, not because of the videos." (Dkt. 24, Killis Dep., at 244:4-9.)

In late January 2013, prior to receiving her performance evaluation, Killis prepared a self-evaluation. In that self-evaluation, she stated:

> Overall, I believe that we had the best year since store open [in 2007]. I'm extremely proud of the improvements we have made . . . I have built a strong relationship with not only the Front End Outfitters but all Outfitters in the store, I have gained their trust which I believe has made me more of a success at Cabela's.

(Dkt. 23, Def.'s Facts, ¶ 67.) In contrast, Killis testified at her deposition that after the video was shown and co-workers made comments about it, she felt that she could no longer trust her co-workers and needed to seclude herself and avoid having any personal relationships. She believed that the comments made her feel "like it was more of a hostile work environment for [her]" because "[she] just felt that [she] couldn't trust the people [she] worked with anymore because of what happened. That's all." (Dkt. 24, Killis Dep., at 244:15-22.)

After Mazzocco completed his investigation, Killis did not raise any further concerns to him, McCroden in Human Resources, Store Manager Art Hall, or anyone else in management.

## II.  LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a

reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. DISCUSSION

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, — U.S. —, 133 S.Ct. 2434, 2441 (2013). To avoid summary judgment on a hostile work environment claim, a plaintiff must "show the following: (1) her work environment was both objectively and subjectively offensive; (2) the harassment she complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there was a basis for employer liability." *Passananti v. Cook Cnty.*, 689 F.3d 655, 664 (7th Cir. 2012). Cabela's argues that Killis has failed to establish that she is entitled to a trial on her hostile work environment claim because the "Physical" Jib Jab video and its aftermath were not sufficiently offensive, severe, or pervasive. Alternatively, Cabela's asserts that even if the court finds that the video and comments are actionable sexual harassment, it is still entitled to summary judgment because it was not negligent in discovering or remedying the harassment.

### A.     Objective Offensiveness & Severity and Pervasiveness

To be actionable as a hostile work environment, the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*,

524 U.S. 775, 787 (1998). In evaluating offensiveness, the court must consider " the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 601 (7th Cir. 2014).

The court must also determine where the conduct at issue falls on the continuum of offensiveness and pervasiveness. As the Seventh Circuit has noted, there is "a line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing. It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other," but the line must be drawn. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (internal quotations and citations omitted). In drawing this line, the court must conduct a fact specific inquiry based on the nature of the conduct at issue and its frequency. *See Howard v. Inland SBA Mgmt. Corp.*, — F. Supp. 2d —, No. 11 C 7905, 2014 WL 1245223, at *12 (N.D. Ill. Mar. 26, 2014). "One instance of conduct that is sufficiently severe may be enough" to prevail on a hostile work environment claim" or "[c]onversely, separate incidents that are not individually severe may trigger liability because they frequently occur." *Nichols*, 755 F.3d at 600-01.

The record shows that Killis is a successful and highly regarded manager at Cabela's. Killis unquestionably believed that the "Physical" Jib Jab video was offensive and at odds with the professional image that she otherwise presented. Other Cabela's staff, including firearms outfitter Samantha Sterinieri and Joe Nebren, who was also featured in the video, shared Killis'

subjective belief that the use of Killis' face in the "Physical" Jib Jab video was inappropriate and demeaning.

With respect to objective offensiveness, Killis and the other individuals who watched the video understood that the body on the character adorned with Killis' face was not hers. As illustrated by the sampling of screenshots from the video that are attached to this opinion as an appendix, portions of the video featured two bodies clad in form-fitting workout clothing moving in ways that could occasionally be viewed as lascivious to an excerpt from the song "Physical" that includes suggestive lyrics. Killis argues that this is enough to survive summary judgment.

The video was inappropriate and in poor taste. It held Killis up for ridicule and caused seven Cabela's employees to make comments to Killis that made her feel shamed. But was the video, when viewed objectively along with all of the comments made by Cabela's employees about the video, sufficient to create a hostile work environment? The court first turns to cases where an employee brought a hostile work environment claim based on allegedly inappropriate visual media.

The Seventh Circuit has affirmed the granting of summary judgment in favor of an employer when a team leader showed the plaintiff "a supposedly humorous video on his computer that included a brief display of male nudity." *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722,727, 729-30 (7th Cir. 2013) ("[s]howing [the plaintiff] one video containing a momentary display of male nudity does not come close to reaching the required level of severity for a sexual harassment claim."). Similarly, the Seventh Circuit has rejected a harassment claim based on, among other things, conversations in the office about visiting a strip club that occurred once a month, a cartoon that was circulated

that depicted two safes engaging in "safe sex," and a comment that the plaintiff's manager could "abstain from sex" like the plaintiff did. *Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 755, 757-58 (7th Cir. 1998).

This precedent appears on point because this case is based on a video. The court, however, finds that it is inapposite because there is a critical and fundamental difference between showing an employee non-personalized inappropriate materials and showing an employee inappropriate materials that refer specifically to her. Moreover, as discussed above, the court will not consider the video without also evaluating the entire course of related conduct that took place over approximately one week. "Jib Jab Friday" was December 21, 2012. Killis asked Hart and Prejean to remove the video on December 23, 2012, and was told, respectively, that she was being "testy" and "[f]uck that, it's hilarious." (Dkt. 23, Def.'s Facts, ¶¶ 43-44.) Seven employees made comments on December 22 (four comments), 23 (two comments) and 26 (one comment), 2012, and during this time, another employee (Samantha Sterinieri) made a supportive comment.

Taken together, these events are not enough to withstand Cabela's motion for summary judgment. First, Killis describes the seven non-supportive comments about the video made by co-workers as "explicit and lewd." (Dkt. 35, Pl.'s Reply, at 6). The court disagrees with this characterization and finds that the comments are not, when considered with the video and the Hart/Prejean comments, sufficiently offensive to constitute actionable conduct. The seven comments fall into two groups. First, employees Tim Callahan and Greg Smith asked Killis if she wanted to "get physical." (Dkt. 23, Def.'s Facts, ¶¶ 62-63.) These comments, taken literally, could be an invitation to participate in a sexual relationship. The context of the comments,

however, belies any such construction. Killis also testified at her deposition that she "walked away thinking what a weirdo" when Callahan made the comment and that she understood that Smith was joking and giving her a hard time about the video. (*Id.*)

Second, employees Kevin Luedtke, Jonathan Barnett, Rick Gorecki, Brian Chapman, and Tom Johnson either asked Killis where she worked out, said that Killis looked good in the video, stated that they liked the video, or said that Killis appeared to have lost weight. These employees laughed, "chuckled" or "giggl[ed]" when making the comments. (*Id.* at ¶ 63.) Hart and Prejean's comments are analogous as both managers, in essence, belittled Killis after she complained about the fact that the video was playing on a loop in the employee break room and refused to address her concerns.

The comments were immature and ill-advised but not sexually explicit or graphic. Title VII vindicates the rights of employees who experience a work environment that is "so severe or pervasive that it alters the conditions of . . . employment." *Parker v. Ill. Dep't of Transp.*, No. 11 C 00192, 2013 WL 5818809, at *12 (N.D. Ill. Oct. 29, 2013) (quoting *Golden v. World Sec. Agency, Inc.*, 884 F.Supp.2d 675, 687 (N.D. Ill. 2012); *see also Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) ("Title VII, of course, does not provide a right to enjoyable work."). The court has considered Killis' interactions with this second group of co-workers plus Hart/Prejean, alongside the two "let's get physical" comments and the Jib Jab "Physical" video itself. They demonstrate that the workplace at Cabela's during the last week of December 2012 had sexual connotations. Moreover, although Smith did not intend to humiliate Killis by creating the "Physical" Jib Jab video, she did so and, according to Killis, the situation made her seek therapy and leave work on several occasions because she felt ill.

The court viewed the entire Jib Jab video, including the final video segment that is the subject of this case. The videos are largely in extremely poor taste and inappropriate in the workplace. Nevertheless, when the entire chain of events plus the length of time that Killis was exposed to either the video or comments are balanced together, the court finds that they "fall[] short of showing the kind of systematic discriminatory behavior that hostile work environment claims require." *Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1157, 1159-60 (7th Cir. 2014) ("insensitive" remarks about the plaintiff's national origin, including a statement that people in the United States should learn English and calling the plaintiff "Maria" did not create an objectively hostile work environment); *Lumpkins-Benford v. Allstate Ins. Co.*, 567 Fed.Appx. 452, 453-55 (7th Cir. 2014) (rejecting hostile work environment claim brought by a plaintiff who found a black balloon taped to her desk after she told her employer that she intended to pursue a claim of racial discrimination when her co-workers received white, yellow, and blue balloons as part of an employee-recognition day); *Nichols*, 755 F.3d at 601 (stating that "while referring to colleagues with such disrespectful language [black n——r and boy] is deplorable and has no place in the workforce, one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability"); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009) ("occasional inappropriate comments, including that [the plaintiff] was 'made for the back seat of a car' and looked like a 'dyke'" were neither objectively severe nor pervasive).

In sum, the video was a misguided, inappropriate, and isolated attempt to celebrate the 2012 holiday season by playing a hit song from the 1980s that has risque lyrics coupled with a Jib Jab video showing characters with the faces of Killis and another manager performing risque

movements.  Following the playing of the video, seven co-workers made comments, such as "let's get physical," that Killis viewed as harassment based on her gender, and two managers refused to remove the video and made mocking comments about Killis' reaction to it.  Killis left work early several time and sought mental health treatment to discuss her feelings following "Jib Jab Friday," even though as of January 2013, she also believed that had "built a strong relationship with . . . all Outfitters in the store" and had "gained their trust."  (Dkt. 23, Def.'s Facts, ¶ 67.)  No evidence suggests that the conduct at issue recurred or was characteristic of the working environment at Cabela's.

Title VII does not establish a scheme for strict liability based on the type of inappropriate and temporally limited workplace behavior at issue in this case.  This is especially true in a situation such as this one where, as discussed below, in response to a complaint, the employer took quick corrective action that prevented the conduct at issue from recurring.  The court does not condone the offensive behavior and recognizes that it shocked and upset Killis.  Nevertheless, after viewing the facts in the light most favorable to Killis, it finds, for the reasons discussed above, that Cabela's is entitled to summary judgment as to Killis' hostile work environment claim because the conduct is not actionable harassment.

**B.    Employer Liability**

The court next turns to Cabela's alternative argument that even if the conduct was actionable harassment, its anti-harassment policy, its response to Killis' complaint, and the fact that the challenged conduct did not recur mean that it is entitled to summary judgment.  Killis disagrees, arguing that she is entitled to a trial because her supervisor, Art Hall, specifically authorized the "Physical" Jib Jab video.  An employer is liable when a supervisor engages in

harassment that culminates in a tangible employment action. *Vance*, 133 S.Ct. at 2441-42.

Setting aside the tangible employment action requirement, the record shows that Smith (a manager at the same level as Killis) discussed "the concept" of Jib Jab videos with Hall (the store manager) in mid-December 2012. (Dkt. 23, Def.'s Facts, ¶ 20.) At that time, Smith showed Hall an unspecified sample video with the face of another manager (Erik Hansen). Smith – not Hall – was responsible for the selection of the songs and the preparation of the videos shown in December 2012. Killis does not contend that Hall knew about the "Physical" Jib Jab video ahead of time. This is consistent with the fact that Smith finished the Jib Jab videos late in the evening of December 20, 2012, and presented them at a staff meeting the following morning. Killis also does not argue that the sample video that Smith showed Hall put him on notice that Smith planned to prepare inappropriate Jib Jab videos. Accordingly, Killis' arguments about Hall's alleged connection to the video are insufficient to establish liability.

Second, an employer can be liable if it is negligent in failing to prevent harassment from taking place. *Vance*, 133 S.Ct. at 2453. "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." *Id*. Cabela's had a mechanism to report complaints that Killis used in response to the "Physical" video, as well as the unrelated prior incident involving manager Slaby's relationship with a Cabela's cashier.

Killis did not work on December 21, 2012, when the "Physical" video was shown as part of "Jib Jab Friday." She saw the video on December 22, 2012, and decided to discuss it with her husband that evening before taking any action. On December 23, 2012, she complained to Prejean and Hart to no avail and was told she was being "testy" and "[f]uck that, it's hilarious."

(Dkt. 23, Def.'s Facts, ¶¶ 43-44.)  Later that same day, Killis left a message (with no specifics)

for Stacey McCroden in the Human Resources department.  December 24, 2012, was the last day

that the Jib Jab videos were played.  Killis followed up with an email to McCroden, and on

Friday, December 28, 2012, McCroden called Killis on her cell phone.

When McCroden and Killis spoke on December 29, 2012, Killis complained about the

video.  She also recounted Prejean's "fuck it" statement, Hart's refusal to remove the video, and

comments that staff made about the video.  Immediately following the 2012 holiday season,

Mazzocco opened an investigation.  He spoke with Killis twice and also spoke with twelve

managers and staff.  In addition, he watched the video and gathered and reviewed numerous

documents, including the Jib Jab employee announcement created by Human Resources

employee Cyndi Dentinger, statements from Erik Hansen, Joe Nebren, Kevin Hart, Chris

Prejean, David Petrow, Claire Lego, Jonathan Barnett, and Stacy Smith, a copy of Killis' notes,

multiple letters of support for Killis, managers' schedules for the last two weeks of 2012,

records of employee badge use by Killis and other employees, information about Stacy Smith's

Jib Jab account, and records relating to photographs stored electronically by Cabela's.

Following the investigation, Mazzocco terminated Prejean's employment.

This response was comprehensive and had very serious consequences for Prejean.

Moreover, Killis does not contend that she experienced any additional repercussions from the

video following the investigation.  Cabela's response to Killis' complaint is a "fundamental

obstacle" that is a further reason why Cabela's is entitled to summary judgment.  *Muhammad v.

Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014) (employer reasonably responded to

employee's complaints about offensive comments and graffiti by painting over the graffiti and

threatening to terminate the co-workers who made the comments); *Chaib v. Indiana*, 744 F.3d 974, 985-86 (7th Cir. 2014) (holding that "the district court correctly determined that there is no basis for employer liability" when co-workers harassed the plaintiff and the employer promptly addressed the issue in a manner that prevented it from recurring because "[n]o reasonable jury could say that her employer was negligent for failing to correct her co-workers' behavior when it apparently corrected all of the behavior she reported.").

This conclusion is not affected by Killis' argument that Prejean and Hart failed to respond appropriately to her complaint about the video and her request to take it down. Killis was able to use other mechanisms to follow up after her unsuccessful interactions with Prejean and Hart and promptly did so. While the record does not specify if Hart was disciplined for his failure to take down the video, Prejean was fired and the video was removed on December 24, 2012, the second day after Killis first viewed it on December 22, 2012.

Killis also appears to be contending that Cabela's did not adequately punish the seven employees who made comments about the video and thus failed to respond adequately to her complaint. She lacks a discernable evidentiary basis to know what action Cabela's took, if any, regarding these employees based on their comments. It is clear, however, that Cabela's mobilized promptly (despite the winter holiday season) after Killis reached out to McCroden. It conducted a thorough investigation and took decisive action, and the complained-of conduct did not recur. Thus, the reaction of Cabela's to Killis' report of inappropriate conduct via McCroden is a second reason why Cabela's is entitled to summary judgment.

#### IV.  CONCLUSION

For the reasons stated above, the motion for summary judgment filed by Cabela's [20] is granted.  The clerk is directed to enter a final judgment accordingly.


Date:   January 8, 2014                                      _____/s/_____
                                                                         Joan B. Gottschall
                                                                         United States District Judge